This is on our docket this morning. The first case is United States v. Barnes. Your Honors, Eddie Castang, representing Dr. Barnes. Your Honors, with regard to sufficiency of evidence, I devoted a substantial part of my brief to U.S. v. Ganji and Davis, this Court's opinion, which I failed to see any difference in the present case. After serving a year in jail, Dr. Ganji was exonerated by this Court and released. The same should apply here, Your Honor. What about the testifying cooperating defendants here seems to distinguish Ganji? Well, I understand. What Ganji said was, where's the insider to say that Dr. Ganji did what Dr. Murray did? Well, let's look at this case. The insider, Lisa Cornell, said there was no conspiracy with the doctors. She said it twice, and then she said all the patients were eligible. Even Dr. Lutz, who was the government eligibility witness for 8 out of 500 patients, never said, and I think I even asked him, he did not call Dr. Barnes and said, oh, by the way, three of your patients that I have reviewed are ineligible. Rhonda, the PA, the physician's assistant, who was supposed to be seeing all of the patients, never told him that anybody was not eligible. Never told him, oh, by the way, I'm not seeing those patients, yet I'm billing for them. I am committing fraud. She said she never told him that. She never told him she was falsifying documents on his G-code billing in connection with the audit under Count 47. So it's exactly the same. There were people around him who were in the fire, but he was outside of the fire, just like Dr. Ganji. Everybody on the inside may, and Lisa Cornell stated that the fraud that she committed was a conspiracy internally for the case mix diagnosis, to jumble up and give false diagnosis to get more money, and she said the doctors were not involved in that. Now, what was proven against Dr. Ganji was that she was not the primary care physician. The Fifth Circus said that was okay. She had a medical director contract getting monthly pay and referring patients. Fifth Circuit approved that. She didn't have personal records, which we were blasted about during the trial, but she had access to the home health records, which was established by numerous witnesses here. Dr. Barnes went to the home health periodically, was on 24-hour call, answered questions by all nurses. His wife testified that the dining room table looked like a home health with all the documents and even took him to bed and was nurses calling at all hours from Abide, so that Ms. Cornell stated clearly that Dr. Barnes did not violate the terms of his contract. She said, I was hoping and expected him to refer patients, but he got paid for his contract, and the contract is also important because if you have a personal services contract, that emulates the medical director contract in this case, according to two separate regulations, immunizes you or exempts you from criminal prosecution because you received money and referred. Under 454, the regulation, you can have a financial interest in the institution and refer business if you have such a contract. Under 1001.92, I believe, it says that it can't even be declared a kickback because you have a contract, and all that was fulfilled by Dr. Barnes. I begged the judge to read that to the jury during jury charges, along with everything else that they call the Bible, Chapter 7, which was convoluted during the trial. We presented a very clear definition of homebound right out of Exhibit 100 and 101, yet Dr. Lutz comes along and says, oh, no, I'm declaring all 500 not homebound, not eligible, because I reviewed eight, and the definition that I used was that he, the homebound person, only can come out of the house with an army, a village, or an ambulance, which another government witness came along and said, that's not true. So all of his diagnosis, and he never saw one patient said he didn't have to. So eight medical records out of 500, and all 500 then became the subject of the criminal case and restitution and forfeiture and the convictions. So that exactly what was proven against Dr. Ganji, and I know what Your Honor is saying, that there were two, three insiders here. Lisa Grinnell exonerated Dr. Barnes. Then Alicia Williams said she only pleaded guilty receiving money for doing marketing, which the Ganji case said was not illegal, but she pleaded guilty to that. And she said, I didn't feel I was guilty, but I pleaded guilty. And then Miss Rhonda comes along and tries to say that, yes, I committed fraud, and in direct examination it sounded real good. On cross, I said, well, did you ever tell Dr. Barnes that the patients were not eligible? No. Did Dr. Barnes tell you to falsify documents? No, but it was implied. That was her word. I'm sorry. Your time has expired. Five minutes? Yes, sir. Oh. Can I make one more point, Your Honor? Sure. I'm sorry. I get into my Exhibit A. There's a lot more I could say, as the court is aware. But Count 47, Your Honors, which the other defendants do not have, is the obstruction. And the clear reading of the statute says that the person who does the obstructing must have received more than $100,000 in a year for that statute to have jurisdiction in the court. That didn't happen. The government and the court said, oh, no, it's Medicare that receives the $100,000. Well, Medicare already has the $100,000. Medicare has trillions of dollars because that's the government. Thank you, Your Honors. Mr. Huey? Is he next? Is counsel for Mr. Molden next? Mr. Huey? Well, are you counsel for Mr. Jones? Are you Mr. Jenkins? I'm asking for William T. Huey for Dr. Molden. Is counsel here? Is Mr. Huey here? Thank you. Good morning, Your Honor. My name is William Huey, and I represent the appellant, Dr. Molden. And I have three points that I want to tender to the court during my time here. And they deal initially with count one of the indictment dealing with the conspiracy and counts 32 through 42 dealing with the health care fraud. First, I would tender to the court the following, that in looking at this matter, in particular the defendants that were placed under the microscope by the government, those two patients of the defendants were unique based on the fact that they each were under age 60, which literally meant that their entitlement on Medicare was solely based on the fact that they were disabled. So in essence, these individuals not only being disabled, they also appeared in a mode to Dr. Molden that basically pushed them in a position that they were entitled or at least compromised at the point in time that they had actually gone into home health. In other words, they were disabled. They did not go into the program based on being age 65 as this relates to Medicare. So in essence, he wasn't dumping individuals into a system that were not in some type of health care position that warranted that they were entitled in some form or fashion to home health services. Secondly, as it relates to the aspect of their agreement, the Croner universe that I referred to and the Bayard Home Health Agency literally was a criminal enterprise, actually documented at the point of trial by the testimony of Ms. Croner in reference to certain acts and actions that were undertaken in reference to entitlement of individuals to home health services, a notation that she made to the fact that the doctors were unaware of the fraudulent activities that took place in her home upsetting and an irony that came from one of the aides that basically worked in the fraudulent activities who was a witness for the government. The individual literally testified to the fact that yes, they were involved in fraudulent activities but took the position that in the plan of care that they sent over to the doctors, that it was the doctor's role to detect their fraudulent activities. It really adds a different twist to the fact of your nurses being your eyes and ears on the ground as it relates to this concept of a medical need. Like I say, this is a part of the record. So would these doctors, in theory, be in an agreement? First of all, with concepts that were going on that they were not aware of and the testimony that was presented by this one particular health care source who was part of the process who literally tended to the jury that they were looking for the doctors to literally catch their fraudulent activities. My third point basically bridges to the anti-kickback issue, but it also has a play in Count 1 and Counts 32 and 42 dealing with the Health Care Fraud Act. That was the issue of the agreement, the contract that the parties were working under. Those particular contracts literally based on testimony from the government are basically contracts that would have fallen under Section 42 CFR 411.354, which talks about the fact that an individual could not be involved in a financial manner with their institution and basically receive funds. That's the anti-kickback aspect. But following in that same section, in Section 42 CFR 11.357, are exceptions that are normally referred to as safe harbors. Literally the testimony that was given by the government's witness basically would have placed these particular agreements in a mode that they would be excluded from the anti-kickback statute, which goes to the issue of the jury charge. My name is Robert Jenkins, and I represent Dr. Michael Jones. We filed a brief in this matter, and in our brief we noted the fact that this was a 21-day trial with no individual coming in to testify that Dr. Jones was engaged in any type of conspiracy. None whatsoever. The start witness in this matter, and if you remember, you all decided, Ganji, that no one should be convicted or can be convicted negligently entering a conspiracy. The state's start witness, Lisa Purnell, testified that she never entered into any type of conspiracy, at least with Dr. Jones, that she never paid him anything monthly, no monthly salary, no kickback, nothing. What the government tried to do was state that because Dr. Jones' wife, Paula Jones, was working there, that was the money to pay her, and the evidence supported that. Ms. Purnell said that, no, this is one of my best workers. I paid her because she was good. I paid her because she did her job. This government also used in this matter an expert witness in this matter, Dr. Lutz, and Dr. Lutz testified under oath that he failed to look at what was necessary in terms of the procedures and the rules under Medicare, so he had never reviewed it. He also said that he had never spoken to, and it would have been better for him to work with and look at and talk to those patients that they alleged committed the fraud, and he said he didn't do it. In this case, Dr. Jones was sitting there with many other doctors, and it was a conspiracy, but they never, ever proved that he engaged in any type of conspiracy. Matter of fact, it was testified, they gave the information that he had no monthly checks, nothing coming in of that nature. So based upon those factors, it's very difficult to understand how he could have been found guilty under conspiracy statute and Rule 29. What's more important to understand is that they also talked about an individual named Larry Taylor. Nothing ever connected Dr. Jones with Mr. Taylor in terms of any conspiracy, any kickbacks, any money given. Dr. Jones, and he was testified at trial, did his job. He didn't do anything that was improper, and he followed the rules in terms of certification. Thank you very much. Thank you. May it please the Court. Dr. Evans has a unique position in this case and in this appeal. He was acquitted of the two major conspiracies in this case, so I'm going to focus on just the specific counts of conviction and the errors that affect those counts. The first comes in Count 31, in which the government indicted, prosecuted, and then convicted Dr. Evans of making the same mistake the government made. Krista Bradford testified at trial in a remarkable display of candor. We made a mistake. We thought that was the other Joe Wee. We thought that was the Joe Wee that was his patient. But he certified the wrong Joe Wee and didn't see either one of them face-to-face within the 60 days or whatever the time frame is, hadn't seen the original Joe Wee since 2009, and never met the second Joe Wee, which is how the mistake was made. So how can you say that that's innocent of falsely certifying homebound? Well, it's wrong because what it did was the government changed its and the mistake is he made a mistake. He shouldn't have certified either Joe Wee, but the 485 that was in front of him was for another doctor's patient. That was the problem. He signs that believing it's his patient, believing that one of his nurse practitioners has in fact referred this patient for home health care. He knows this. You have to do the face-to-face. The doctors know this. They know they have to do the face-to-face. It's not good enough to go, well, a few years ago I remember this person had a problem, so I'll just certify them. But that's not what he was prosecuted for, Your Honor. He wasn't prosecuted for not doing a face-to-face. That wasn't what the indictment was about. What the indictment was about was very specifically not having seen this specific Joe Wee for four years since 2009. The problem is that the 485 he signed was for the other Joe Wee. But he never saw it, so I guess I'm having trouble. I mean, I understand they should have gotten the right Joe Wee, but the fact is he didn't see either one. If his claim was you all prosecuted me for the wrong Joe Wee and I saw the right Joe Wee, then we'd have a really different case. You probably would have won in the district court. But I'm just having trouble with how it helps you. Because, Your Honor, what you're doing is reaching beyond the indictment to convict him of a crime he wasn't charged with. What we have here is the government makes a mistake as to which Joe Wee it was. You're just relying solely on the indictment was specific to one Joe Wee and proved the other, and that's the end. That's the basis of our criminal justice system. He's entitled to notice of which Joe Wee. They got the wrong Joe Wee, and then finally, in their brief, they change their theory of prosecution a third time, and they say, Oh, no, the indictment, Count 31, mistakenly described two different people named Joe Wee. No, it doesn't. It describes one. It's just the wrong one. Legally, every alternative is a dead end for the government in this case with regard to Count 31. You can't salvage it. Judge Owen, you sat on the Hoover panel, and this is identical to what happened in the Hoover case, and for the same reasons, this count has to be reversed just as it was in the Hoover case. Let me address this, Dr. Lutz, because I'm feeling like I'm not getting what the district court thought was okay about Dr. Lutz having the wrong definition of homebound and using that to question the doctors in this case. We don't get that either, Your Honor. We don't understand how the government can put on a home health care expert who's never read the home health care regulations and who gives them. Well, I mean, I agree he can be an expert on whether somebody has diabetes or not without knowing the home health care rules, but he testified that somebody isn't homebound, and homebound's a really specific term that doesn't mean only people that are hiding under the bed forever. It does mean people that can leave their house, but they have to have help and so on and so forth. You're absolutely correct. Judge Gorsuch, who's now Justice Gorsuch, in Caring Hearts v. Burwell, which deals with Chapter 7 and the home health care regulations, said Chapter 7 is a controlling regulation, and so under both Daubert and Kumho-Tyre and FRE 702, you have to tie your expert opinion to something very specific that is a reliable principle. Dr. Lutz didn't. Dr. Lutz only made passing reference to Chapter 7, and then he said, oh, they're liberal. Well, no, they're the law, and if it's a controlling regulation and you ignore it but you give expert testimony and that's the only evidence that these people were not homebound, that's reversible error. I see I'm out of time. Thank you. Good morning, Your Honors. Elizabeth Stepp here on behalf of Paula Jones. I know that there has been a lot of the record is long and you're familiar with it, but I do want to point out briefly that Ms. Jones is in a different position from every other appellant that is here before you today, and that is Ms. Jones is not a doctor. And does that make a difference to this issue of when you're having to rebut the notion that all of the dollars were fraudulent and you're having to come in and show, no, some of them were legitimate? The argument is, well, the defendants are in a better position to prove that, but your client isn't because she's not a doctor. She's a billing personnel. Does that make a difference to that analysis? It does, Your Honor, because, in fact, there is no, to jump ahead a little bit, in Ganji when this court was talking about Elaine Davis, who was not a doctor, and what the court said was, you know, the nurses didn't write down this patient is not homebound, this is a fraudulent thing, and so, therefore, the owner of the company wouldn't know that that was fraudulent. And the same thing is true with the biller. If the bill comes in and says, this person is homebound and they have diabetes and this and the other thing, and I went and saw them today, she doesn't have any knowledge of that. She doesn't treat them. And, in fact, what would be illegal would be the argument that she does know something that at least some of these are fraudulent, because that's what she was convicted of. So I'm just getting to the sentencing question. I understand you disagree with the conviction. But if she was correctly convicted, then whose burden is it to show, hey, she had no way of knowing, you know, 90% of them might have been legitimate, even though a few of them were not. How would that work? What's the physics of that, given that she's a billing person? You know, I think it is difficult to say, well, if the jury was correct and allowed to find that she was able to be convicted, that would imply that she must have known, right, that she was ‑‑ that something was fraudulent. How much of that she would have known, I think it's always the government's burden to prove the amount of the fraud. And so, you know, we get to sentencing, and I think we were actually going to rest on our briefs on the restitution point, but you can see she was charged with an amount of $3 million, which was ten times as much as what she received, and it was three times more than any doctor who was actually doing the fraudulent things. And so that implied that she knew that every single bill she submitted was fraudulent. There's no indication of that, right? No. I mean, this company did have some patients who really were homebound. Yes, and they had some patients who were private pay as well, who weren't Medicare patients, who they were billing different insurance companies for, and so that wouldn't be a part of this either. But that wasn't part of the ‑‑ No, that wasn't. They tried to separate that out and do percentages and that sort of thing, and so I think they sort of went with the best they could. But I think the bigger issue really is that, you know, there just isn't any way for her to have known that these people weren't homebound. There's no proof other than the fact that she got a raise that she knew that anything suspicious was going on. But wasn't it a large raise?  I mean, but it was also a raise. Well, I don't remember ever having my salary doubled. I would say that if it was your ‑‑ if my salary was doubled, Your Honor, I would say that I would not ask my boss why that happened. I like to think that I would say thank you, but I don't think that's relevant. Her husband was the doctor, you know. Right, but, I mean, we can't infer someone's knowledge because of their spouse. I mean, I don't think you can say because her husband was in a conspiracy, she was necessarily in a conspiracy if no one told her that. No, but it's part of the whole mix. That is the government's theory. It wasn't just a raise because all of a sudden we're making a lot of money and we want to share that with our employees. It was a raise at the same time as Welnesha Jakes got a raise that was larger than the one that Ms. Jones got. It was a raise at the same time that she became the CFO, and it was a raise that was closer to the salary that she was making pre-Katrina before she and Dr. Jones left New Orleans and then came back afterwards. So there were other reasons for the raise, and the problem is the tying it together. The government certainly had the theory, but I think if you look at the facts in the Ganji case about Elaine Davis, you know, Elaine Davis paid bonuses for whoever referred the most new patients and she, you know, gave people trips to Vegas, and this court still said you can't prove that she knew those people were homebound because it didn't say that.  Someone said to Ms. Jones, we're going to give you this big raise and your husband's going to send us some fraudulent patients, and that's how we're going to give a kickback to him. Those are two separate points. I mean, you could legitimately have a homebound patient, but you're paid for the referral to Company A rather than Company B, and that would be the anti-kickback versus you're not paid for the referral but you have someone who isn't homebound and you certify them as such, or both. Correct. The two are separate concepts. Somebody could be homebound, but there could be a kickback for referring them to Company A rather than Company B. That's correct, Your Honor. I think that was the two conspiracies that were charged, I believe, and in this case I just don't think there's evidence of either. Thank you. May it please the Court. Diane Copes on behalf of the government, and with me is Sharon Lieberman who is trial counsel, Ryan McLaren, and our Chief of Appeals, Kevin Boydman. Your Honors, this case is just not gonging. Here, witness after witness. Would you go specifically defendant by defendant? I'm sorry. Would you go defendant by defendant on the convictions first? Yes, absolutely. Okay. Starting with Shelton Barnes, first is the personal contract. He started out without one and was getting kickbacks then, and the testimony was that the contracts and the invoices were put into place without meaning, just to paper the files, and that the doctors signed randomly-made invoices. In other words, Elenicia Jakes, who was second-in-command, and others would fill out the invoice with just a bunch of random things that they said the doctor did, and then the doctors would sign that and they would keep it in their records in case of a Medicare audit, and that's an aspect of his concealment, and it also demonstrates that the agreements were put into paper, the file, to cover up the kickbacks in case of a Medicare audit. And, Your Honor, the jury heard from Shelton Barnes' nurse practitioner, Rhonda Mayberry. She testified at length to his knowledge and participation. Wasn't it mainly implied, like, well, you didn't, I mean, you know, kind of had to know, and, I mean, give me something to hold onto here. Okay. So he joked that she was signing his name to 485. She wasn't doing this as a nurse practitioner, and she testified, and so did Alicia Williams, who was his biller and also worked for Abide while getting paid for referrals, and both of them pleaded guilty, by the way, and they were accomplished testimony. Anyway, getting back to it, Shelton Barnes joked that Rhonda Mayberry signed his name on 485s better than he did. So he knew she was signing his name on 485s and certifying that these patients were homebound, that they needed skilled nursing or therapists. What piece shows he knew that wasn't true? I agree he shouldn't let her sign his name, okay, but that's not what he's being prosecuted for. It's the certifying people as homebound that weren't. And how did he know she wasn't actually going and seeing these people and they weren't actually homebound? Because she came to him, and this is her testimony, and she said, I'm worried. We are certifying patients who have been homebound for more than five years. We haven't set any goals for them. And she was very upset, and this is her testimony, and he said, oh, okay, I'll sign your name. I mean, I'll sign my own name from now on in case something comes up, in case something happens. And so she also testified. How do you know most doctors are scared of Medicare? I mean, the fact that you're scared that something you do may be technically a problem, to me, doesn't suggest that you know that this person isn't homebound. Because you're worried that this is the government, they're very technical, Medicare is highly regulated, it's very technical. Some doctors will not accept Medicare patients exactly for that reason. They don't want to deal with this. And so I don't know that them being concerned that somebody's been homebound for a long time, which may raise questions, and therefore we need to be sure we're complying with all the technical rules, is the equivalent of a knowing false certification. Lisa Cornell and her second-in-command, Wilnesha Jakes, both testified to Shelton Barnes's knowledge of the conspiracy. And more than that, he was getting kickbacks, and there were certain other things that were happening, like he was signing shuffle diagnoses, patients were being shuffled amongst the doctors. For example, Catherine Ned was seen by Shelton Barnes, Gregory Molden, Henry Evans, and her cousin got up and testified that she liked to take the bus to appointments, she sung in the church choir regularly, she liked to go to the snowball stand, she liked to go to Walgreens. And this was Gaynelle Leal, who was a nurse at Abide, who just happened to be the cousin of Catherine Neal. And all of these are incentivized by the kickbacks that they were receiving. And there was just so much testimony. Alicia Williams testified. Chief Judge Owens, do you want to go on to Molden? I do. I just want to add this. No one testified that Shelton Barnes ever came to Abide to review patient records, and after they went on the Kinzer software, where the nurses kept their notes, he didn't get a password, he never signed in. We had testimony from the Kinzer representative to that effect. Dr. Lutz testified as a fact witness about patient Harriet Hall, and she was one of Sheldon Barnes' certified patients. Dr. Lutz said he was her primary care physician, he had no idea she was in home health care, and that she actually ended up in the hospital needing blood transfusions because Dr. Barnes put her on over-the-counter NSAIDs, I don't know how to say that, like Motrin, and these have the effect of thinning her blood at a time when she was also on medications from Dr. Lutz, and those were contraindicated because they both. That's malpractice, that's not fraud. But it's demonstrating the real consequences of what these doctors were doing, and that is they weren't seeing these patients. And one more thing about Dr. Barnes, he had no patient records whatsoever for the majority of his patients, and so one of the things they certify under 485 is that this patient is under my care, and he didn't have any evidence of that. As to his medical agreements, they capped how much he could get in terms of kickbacks, and he was supposed to invoice them, which is the fake invoices that I mentioned. And so a lot of this is true for all of the defendants, and that was why. Was there a deliberate ignorance instruction? I'm sorry? Was there a deliberate ignorance instruction? Yes, Your Honor, and also a very thorough good-faith instruction. Now, in terms of the others, Paula Jones was the heart of the scheme. She wasn't lumped. Wilnesha Jakes, who was a second-in-command, testified to a real conspiratorial meeting with her where they discussed that her husband was going to be referring patients and that her salary increase had nothing to do with her brilliance or master's degree or anything else. Wilnesha Jakes took the stand and testified that as second-in-command, she met, and her mother did too, with Paula Jones, and they discussed the kickback arrangement and that her pay increase was for her husband's kickbacks and not for anything based on her salary, and that is page 7234 of the record. So on Paula Jones, can you explain how she's better positioned than the government to prove what wasn't fraudulent about the $3 million she's now been charged? The district court made a finding at sentencing under Hebron that the fraud was so pervasive that you couldn't ‑‑ sorting out the legitimate from the illegitimate Medicare claims was not feasible, and this is a similar Hebron finding applied in the Medicare billing context as a conma, as an emo. Doesn't it seem a little bit funny that the billing person, who has nothing to do with deciding whether somebody's homebound or not, is paying the most of anybody for this? She's just a person who's ‑‑ I agree, the jury found that she's facilitating it knowingly, but still, she alone couldn't have done this fraud. No, but she returned. She had an amount, and that's $2,100 that she knew was the breakeven amount, and several witnesses testified that she returned any patient records that were going to be the basis to the nurses. I mean, I understand how there's an argument she should pay something. I understand there's an argument that the conviction was proper, but why should she be ‑‑ it just seems very odd to me that the least involved person in terms of the medical decision‑making is paying the most. At the sentencing, the district court found that Paula Jones played a central role in the administrative apparatus of the Abide Conspiracy. That's at page 16083 of the record, 16083. Paula Jones was instrumental. She was the heart of this fraud, and without her false billings, they wouldn't be here. There wouldn't be the money, at least, other than the doctor's Part B billings. She kept this fraud going. She returned files when they weren't enough. Agent Bradford testified two times when she green‑lighted under the cancer system. You have to have three green lights. This is a computer program for billing. They all have to be green before you can bill under cancer. And Agent Bradford testified that she pushed bills through and said there was the proper documentation when there wasn't. And she knew what she was doing. She billed for Dr. Jones. She's very experienced in the Medicare area. She's ‑‑ I'm sorry, I can't find the word. But she was ‑‑ her hand was in almost every pie. I want to ask you something else. I want to ask about Dr. Lutz. People are pronouncing it differently. Lutz or Lutz, whatever. Dr. L. How can it be that it's okay for an expert to get up and testify that somebody is not homebound based on anything other than the Medicare definition of homebound? Your Honor, this case isn't about violating the medical regulations. It's about the medical regulations aid jurors in evaluating whether defendants knew what they were doing was wrong. But it's not wrong if the person is homebound. I understand the kickback. I'm putting the kickback aside. But I'm talking about the conspiracy to falsely certify people. Okay? That is not false if the person is, in fact, homebound and needs that care. So while Dr. Lutz can testify somebody isn't a diabetic or something like that, I get that, that isn't necessarily the same thing as being homebound or not. Right? But medical necessity of the services is, and he testified, for example, these doctors used the diagnosis of cerebral lipidosis. That is a rare genetic disorder. If you look at Dr. Slansky's charts, that appears in a very tiny portion of the population anywhere. And they were repeatedly using diagnoses like cerebral lipidosis, like rheumatoid arthritis. There were four or five of the highest pain. The problem isn't that they weren't homebound. It's that they didn't need care. That, an occupational therapist and a physical therapist, for example, went out to see one of the patients and couldn't figure out why they were there. Other family members, like Evelyn LaCour, they testified that these patients were not homebound. I'm just, I'm focused. I understand the, I mean, there's a lot of evidence in this case. I'm not talking about that. I'm focused on the expert because I think juries put stock in experts, and I understand that he can testify to a number of things that are relevant here, but I'm just wondering, it seemed to me that he has a very narrow definition of what's homebound. You have to be removed by an army or an ambulance. Not a lot of people would meet that definition who nevertheless are clearly homebound. How can he be allowed to address that? How can he be allowed to testify along those lines in front of a jury when he doesn't know that that isn't required to be homebound? He was offered as an expert in internal medicine and the medical necessity. The district court found, the district court, by the way, went through every one of their arguments in a 115-page order beginning at page 3315, including this one, and I feel like I'm not doing the evidence justice. So if you want to get a very thorough analysis of every piece of it. I'm not aware of the district court's addressing. I'm asking you. No, I know. I just wanted to tell you that part. The district court is going to be a district court's writer. They wouldn't rule that way. I get that. After he testified, we put on a Medicare expert, and she was offered as an expert in Medicare generally, in homebound, and she testified that as far as the standard of it takes a village, that that's not the standard. She made clear to the jury what the standard was, and his testimony was more just a doctor looking at these files and saying, these patients don't have cerebral lipidosis. These patients aren't almost blind. These patients don't have anything in their patient records about rheumatoid arthritis. They were using the very highest billing codes. They were shuffling them around, and he could observe that, and he did. They were just shuffled cerebral lipidosis with rheumatoid arthritis or hypertension. He was absolutely testified to say that these patients didn't have what the records say they have because he reviewed the medical records, including the nurse's notes, any of the Medicare billing documents, the 485s, other doctor orders, and all of the materials he reviewed, you'll see beginning at government, Exhibit 400. Those are the patient files, and there's quite a number of them. So he looked at the files. Did he go to a patient and physically say, okay, you're not blind, you don't have any of these, or did he base it on anything other than the records? He based it on the records, the available records, because that's what he was offered for. That's what experts do. He was offered to look at their records, and Lee Ann Dotson, by the way, the Medicare expert, said that the doctors were required to keep records for five years, and, well, it was Sheldon Barnes he didn't have much to look at, although he did testify as a fact witness that his patient, Harriet Hall, did not need home health. But he was testifying as, I'm looking at these patient records, and I'm not seeing patients who, one, have these conditions at all, like cerebral lipidosis. He didn't see evidence of hypertension, for example, and nurse practitioner Rhonda Mayberry also testified about how the patient didn't have hypertension, but it was certified that she did. She identified signatures. And there was also nurse testimony, nurse practitioners, field nurses, office nurses, office staff, and, again, Lilnaysha Jakes, who was second in command, set out a whole lot on the administrative side and explained a lot of the ins and outs. But the bottom line is the jury heard from Lee Ann Dotson after Dr. Lutz. She said that it takes a village, it's not the standard, and the district court found that Dr. Lutz was sort of using hyperbole. If you heard Dr. Lutz, Dr. Lutz is a very expressive person, and the jury could consider the fact that Lee Ann Dotson testified, and she was actually the expert on the regulations. She gave the correct one. And, again, there were other questions in addition to homebound on the 485s, not only homebound but in need of skilled nursing and under the doctor's care. And so he testified as to just medical necessity, but we had another expert who came later and said that the standard that he said, I believe on cross, was not correct. Oh, I'm sorry. Your Honor, I actually, Judge Owen, I didn't continue on sufficiency, and I apologize. May I go back to sufficiency? My counsel just passed me a note and said that I hadn't. Yes. Henry Evans was convicted of five executions of a multimillion-dollar scheme to defraud. His sentence was based on the scheme to defraud, and Marion Grace and Joyce Williams were executions as part of the scheme to defraud. There was not only Dr. Lutz's testimony as to patient Marion Grace not having cerebral lipidosis, but Henry Evans testified that his patient did not have cerebral lipidosis and that many of the 485s he signed contained fake diagnoses, and Agent Bradford testified how he certified a localized rash as a diagnosis for home health, as a primary diagnosis and the driver of that particular home health episode. Marion Magrie did not have rheumatoid arthritis. She didn't have low vision. She didn't have stomach function disorder. She didn't have anthropathy, and she didn't have cerebral lipidosis. These are all ñ these different diagnoses are all analyzed by our statistician expert, Dr. Slanky. What about the conviction involving Joe Weed? Oh, yes. I'm sorry. There's so much to cover. Again, that's why I apologize and do refer you to the order by the district court. She sat through the trial. She heard it all. But as to Joe Weed, there's no question that the Joe Weed described in the execution, just like mail fraud, you have a list of claims, and they have the date, they have the patient, and that was the wrong Joe Weed from the patient that he actually treated. In another part of the indictment, there was actually some description of the second Joe Weed, the 2009 Joe Weed that he said he had seen but not for five years. Do you agree the conviction has to be based on who's named in the indictment? I don't, Your Honor. And the reason for that is because the heart of his crime is a scheme to defraud. Right. And at most, there was a material variance. And we get into this better in our brief than I'm doing right now again. But there was a material variance at best between the Joe Weed that's in the indictment and the, well, we put evidence of both Joe Weeds. And, by the way, Agent Bradford explained those. Let's say, like you said, it's a scheme to defraud like mail fraud is the classic one. If the indictment says there was a mailing in 2010 that was fraudulent and at trial you prove up one from 2015, you think that's only a material variance? It doesn't reach a greater error than that? Your Honor, the purpose of the indictment is to give notice. You've got to let them know what you're talking about. He was on notice to defend a patient named Joe Weed. A different patient. Well, either way, as Judge Haynes pointed out, he had, she was not under his care. And that was the main point. But he didn't. Right, that's why I, oh. I'm sorry, go ahead. That's why I thought your argument was going to be the one in the indictment was actually also because she wasn't under his care was, but. The one in the count in the indictment he had never seen. He, there was one that he had seen, but not for five years. Agent Bradford explained all this. And he never objected to the sufficiency of the indictment, not at trial. He didn't say, I didn't have notice. Whoa, wait a minute. So the indictment, a problem with the indictment is judged by whether it's a material variance. And it's, I mean, our position is it's not because he was on notice. And he did testify as to both of them, and so did Agent Bradford. So the jury heard that and could give it the weight that they deemed it was due. And the jury actually surgically addressed Joyce Williams. I guess that's the wrong word. But there was a 485 that was signed for her, and there was a 485 that was not signed. The jury convicted on the one that bore Henry Evans' signature that she was under his care, because either way she wasn't. And so, I mean, our position is you can confirm because of all of the evidence that was presented, but even if you disagree with me, Henry Evans was sentenced as to his entire scheme to defraud, which is the law in this area. So even if you disagree with me on Joyce Williams, it wouldn't affect his sentence. So I'm just, but again, the district court went through all this, and the crime is the scheme. And he was on notice that he needed to defend against Joyce Williams. I haven't gotten to Dr. Molden's testimony, but this case in general, and I just tested on his. I've been looking at this too long, Your Honor. Yes. There were, this case is unusual in that there were, and I'm going to address Dr. Jones as well, there were actual conspiratorial meetings here. I mentioned Rhonda Mayberry and Shelton Barnes, and Rhonda Mayberry testified at length, so did nurses and others about all of these doctors. So Gregory Molden was with another home health agency. He had a couple of patients that abided. Lisa Crinnell came to him because he hadn't signed the 485s for the handful of patients he had that abided, and he had had a falling out with the home health agency of Joe B. Greer is the name of the doctor. He had a falling out there, and he told Lisa Crinnell two things. One, he would not sign the existing 485s unless she paid him kickbacks, and two, that he would bring all of his patients over from this other home health agency to abide if she would pay him. And he asked how much Shelton Barnes was making, and then he asked for almost double that. He asked for $5,000 a month. And the agreement, which was quite a bit more than the agreements actually allowed, and they were paid in round numbers. Anyway, Gregory Molden, he brings all his patients over, including Shannon Bursey is one of the ones that he transferred, and also Kenneth Trish. Mr. Trish wanted various things. For 15 months before he was certified for home health, he came to the office almost every single month. He came to Dr. Molden's office on his own. And then after the agreement was in place, Dr. Molden referred Kenneth Trish to home health. Apparently he got tired of it because he would not be there when the home health aides came, and they had a number of missed visit forms. And finally they had to discharge him, which they didn't do very often, based on the fact that they can find him. So all of that together, and especially this conspiratorial meeting where he goes and he asks what's Sheldon Barn being paid, I want more. He was being paid $3,500, I want more. And he held the existing 485s hostage until Lisa Cornell agreed to it. And that is very strong evidence of his guilt. And also Lisa Cornell testified that as to all these doctors, they knew part of the deal was they had to sign the 485s. And they did. So that was part of the pay that they were receiving. So anyway, that's Molden. Let me go to... I'm out of time? Oh, I'm sorry. Again, I would just like to refer you to the district courts sentencing as well. She's really done a very thorough job. Your Honors, on page 10085 of the record, Dr. Lutz was tendered and accepted as an expert in the field of internal medicine and, that would be for your diabetes, and the medical necessity of home health services. So he held himself out to be an expert. And the government did not step in and correct his misdefinition and let him extrapolate to 500 patients for that jury because of his wrongful definition. As far as his own patient, Ms. Haha, he said he hadn't seen her in four years. He couldn't find the record because it had become lost. And I didn't think this was about medical malpractice as to whether he should have given him a prescription drug or over-the-counter. Apparently, that's where it went. And Ms. Haha is one of the ones who submitted a patient consent form. She wanted home health. She voluntarily entered it after he testified that she was involuntarily brought in. People devolve over time. You can be perfectly fine and then four years later you're home. No question about it. So when she shows up with a consent form, and I couldn't get into evidence as part of the appeal, Judge Undegangi, you can call him lax. You can call him negligent for not knowing what was going on behind his back with Rhonda Mayberry and Alicia Williams splitting referral fees and one of the others in the office. You can call him lax for not knowing what Rhonda Mayberry was up to. Call him deliberately ignorant? No, sir. He was not. Because he was practicing medicine, seeing patients in his office, working, according to his wife, night and day, and he relied on his PA, who had a medical degree herself, not a doctor yet, and so he relied on his billers and his nurse. And I have to say, Your Honors, the improper comment by the prosecutor in this case was egregious. It was shocking. It was embarrassing. She walked over to our side of the table with her hands up and pointed, we don't have a video, saying, calling the clients elitist, I guess because Dr. Barnes, a 38, 63, 65-year-old African-American doctor, is an elitist and over and over above the Medicare and Medicaid patients that he saw, the poor people of this city, and that he doesn't care about them? And that's a personal opinion, and it's outside of the record, as well as— The defense at first said the Lutz was an elitist. Isn't that how it all started? Doctor, I did not. I said nothing. Right, but that's what started the whole issue with the clothing. Well, but Judge, there should have been instruction. There should have been an instruction. There should have been an apology. But that was right before the—and the judge said that was an improper comment, but, but, but, it came too late. It came right before that verdict form was given to the jury. So it came at the worst time. And if this court doesn't stop that, it's going to happen again. You've exceeded your time. Excuse me? Your time is up. Thank you, Your Honors. Thank you. At page 6162 of the record, the government's witness actually read into the record the exceptions that deals with the agreement, which is the heart of the kickback aspect. Judge Costa asked a question about a good faith instruction. The bottom line is that the court allowed the exceptions to be argued as props before the jury but did not incorporate the exception as an affirmative defense in the jury charge. So in essence, I contend to the court that the arguments and the exceptions under Good Harbor literally were conflated into a good faith instruction when they should have been an independent instruction presented to the jury dealing with the governmental regulations under 42 CFR 411.355 through 356 that states that those— There's a lot of these cases out there. Are there any that have given an instruction with specific regulations in the jury instructions? Your Honor, I know there are cases that are back and forward on the issue, but this is so specific to the fact that this is the language that literally says that you are not subject to the kickback statute if you fall into these exceptions, and literally that was never presented to the jury in the charge. You could argue it, yeah. Do you check it under good faith? I doubt not. It's an exception. It should be singled out as an affirmative defense. Judge Costa, as your question revealed, the government does not understand the difference between a variance and an indictment and an amendment to the indictment. The count relating to Joe Wee specifically states, beginning in July 2013, Evans began certifying Joe Wee for home health at Abide, even though the last documented visit Evans had with Joe Wee was in October 2009. That's the charge. There is nothing about face-to-face encounters. And to address your comment, Judge Haynes, if you refer to our reply brief at page 12, footnote 36, a face-to-face encounter can be performed by a nurse practitioner or a clinical nurse specialist. I mean, I'm aware of that. And did Dr. Evans have a face-to-face encounter? No, he did not. It was not required. Any indication he was relying on Mayberry on that case? I understand he may have relied on her elsewhere or someone else, another NP, but was there evidence of that here? There was no evidence one way or the other. The only evidence at trial related to count 31 was the testimony from Dr. Evans that he had made a mistake and the testimony from FBI agent Krista Bradford saying, well, we actually picked up the wrong file. Why isn't it deliberately ignorant if he's not meeting with patients, if the forms aren't being signed properly? Why isn't that just trying to hide from the fraud? I don't think deliberate ignorance, Your Honor, respectfully, fits into the charge in count 31. They didn't charge him. They charged him with something. I'm saying more generally. More generally. It may, Your Honor, but it doesn't apply to him because he was acquitted, mind you, of the two major conspiracies, and we're dealing with very specific charges in this case. And there are six cases directly on point that deal with the admissibility of Dr. Lutz's testimony. It was inadmissible. Your Honor, just going back, I thought it was illuminating that the government said, well, you know, it was really hard to tell how many of the bills were fraudulent and what bills weren't fraudulent, and it was difficult to do. And, in fact, the judgment itself, I think, says that the amount was extrapolated to come up with this $3. something million. I did go back and confirm the cases U.S. v. Benin, which says that it's the government's burden by preponderance of the evidence to show the amount of the fraud that should be charged. And in U.S. v. Klein, this court said you can't just add the facial amount of the bills that were submitted to Medicare together and say, well, there you go, that's the amount of the fraud, that you have to take out the amount that was legitimately performed or was performed. And that is, again, it may be difficult to do, but that doesn't take away the government's burden to do it and put the burden onto the defendant. Well, there's sort of two pieces to it. If the person didn't need treatment at all, then the whole amount is fraudulent. If the person needed treatment but didn't need home health care, which is more expensive, then there's a piece of that, they needed the treatment but should have come to the doctor's office for it, that piece would be legitimate, the in-office charge, but the part that would be illegitimate would be the home health minus in-office charge. Correct, Your Honor. I don't know the details of that. I do want to also mention that the evidence that the government cited to you specifically as to Ms. Jones, it does not exist in the record. At page 7234, if you read the testimony about the Jakes meeting, I know that they think that it says that either Jakes or Cronell told Paula Jones that the raise was for referrals. That testimony did not come in. And, in fact, Lisa Cronell said Dr. Jones gave referrals before the raise, after the raise. Paula was a crackerjack biller. The accountant agreed with that. There's no testimony that anyone ever told her that, that she ever knew that. And, in addition, Your Honor, in six seconds, we would also like to draw the attention to the severance issue, which we think because of all of the testimony about these supposedly bad home health, it would be easy for the jury to say everyone must have known, look how many, we just had four weeks of testimony that no one was qualified for it and that this, therefore, the biller must have known. Thank you. Thank you, counsel. We appreciate it.